IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–02231–EWN


SELEDON VILLANUEVA, JR.,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of the Social Security Administration,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is a social security benefits appeal.  Plaintiff Seledon Villanueva, Jr., challenges the

final decision of the Commissioner of Social Security (the "Commissioner"), denying his

application for disability insurance and supplemental security income benefits.  Jurisdiction is

premised upon 42 U.S.C.A. §§ 405(g), 1383(c)(3).

### FACTS

*1.*    ***Medical Evidence***

      Plaintiff was born on August 25, 1952, and was forty-eight years old at the onset of his

alleged disability.  (Admin. R. at 519 [filed Jan. 12, 2007] [hereinafter "Admin. R."].)  Plaintiff has

a high school education, attended one year of college, and has some technical training relating to

his work in the electric power industry.  (*Id*. at 60.)  Plaintiff has worked in the vocationally

relevant past as a control specialist in an electrical power plant.  (*Id*. at 55.)  Plaintiff alleges he

became unable to work beginning on June 18, 2001, due to major depression, anxiety, an injured

left forearm, and back and ankle pain.  (*Id*. at 54–55.)

### a.     *Treatment Records*

#### (1)     *Records Submitted to the ALJ*

On May 14, 1999, Plaintiff had a screw and plate device inserted across a fracture in his

right ankle.  (*Id*. at 246.)  From September 19, 2000, to January 18, 2001, Plaintiff received

treatment at Maple Leaf Orthopedic in Pueblo, Colorado, for discomfort relating to this hardware.

(*Id*. at 243–46.)  On September 19, 2000, Kenneth Danylchuk, M.D., determined that Plaintiff's

ankle fracture had healed, and scheduled the removal of the hardware.  (*Id*. at 245.)  By January

18, 2001, Dr. Danylchuk advised Plaintiff he could participate in his usual activities with no

restrictions.  (*Id*. at 243.)

Between December 17, 2000, and December 22, 2000, Plaintiff was treated at Parkview

Medical Center ("Parkview") in Pueblo, Colorado, for alcohol withdrawal, alcohol dependency,

cocaine abuse, and nicotine dependency.  (*Id*. at 81–82.)  From December 26, 2000, to December

29, 2000, Plaintiff attended an intensive relapse prevention group.  (*Id*. at 79–80.)

On January 17, 2003, Plaintiff sought treatment from the Las Vegas Medical Center

Community Based Services ("Las Vegas Medical Center") in Las Vegas, New Mexico, for

anxiety, depression, poor concentration, short-term memory problems, fatigue, insomnia, feelings

of worthlessness, and irritability.  (*Id*. at 167–76.)  Rachel Kavanaugh, L.I.S.W., assessed Plaintiff

with, *inter alia*, adjustment disorder with mixed disturbance of emotions and conduct, and a history of polysubstance abuse. (*Id*. at 168.)

On February 10, 2003, Plaintiff was treated at St. Mary-Corwin Hospital ("St. Mary-Corwin") in Pueblo, Colorado, for an overdose of alcohol and cocaine. (*Id*. at 221–31.) Plaintiff complained of moderate to severe depression, but denied that his overdose had been a suicidal gesture. (*Id*. at 223, 228.) Plaintiff was diagnosed with substance abuse and alcoholism. (*Id*. at 221.)

On February 14, 2003, Plaintiff sought treatment at Southern Colorado Family Medicine ("Colorado Family Medicine") in Pueblo, Colorado, for depression and anxiety. (*Id*. at 102.) Plaintiff's treatment records noted chronic problems with depression, anxiety, alcohol abuse, intravenous drug use, and suicidal ideation. (*Id*. at 104.) Plaintiff was assessed with a recent suicide attempt and depression, and was prescribed an antidepressant. (*Id*. at 103.)

On March 7, 2003, Plaintiff returned to Colorado Family Medicine for follow-up on his depression. (*Id*. at 100.) David Merritt, M.D., observed that Plaintiff was "extremely tearful and clearly quite depressed." (*Id*.) Plaintiff was assessed with acute exacerbation of depression without suicidal ideation. (*Id*.)

On April 3, 2003, Plaintiff returned to Las Vegas Medical Center, where Lawrence Lazarus, M.D., assessed him with major depressive disorder. (*Id*. at 158–59.) Dr. Lazarus noted that Plaintiff's: (1) depression was responding to his antidepressant; (2) appetite and mood had slowly improved; and (3) mental status examination revealed "a mildly depressed man." (*Id*. at 158.) Dr. Lazarus increased Plaintiff's antidepressant dosage and prescribed Plaintiff a sleeping

aid. (*Id*. at 159.) By May 9, 2003, Plaintiff reported improvement in his sleep and depression and a variable appetite, but stated his depression remained variable from day to day. (*Id*. at 154–55.) Dr. Lazarus noted that Plaintiff's mental status examination revealed "a moderately depressed man who seemed kind of fidgety and nervous," and updated Plaintiff's diagnosis to include chronic alcoholism. (*Id*. at 155.)

On May 18, 2003, Plaintiff was diagnosed at St. Mary-Corwin with a broken left wrist sustained after falling off a stair and trying to catch himself. (*Id*. at 207–17.) By June 12, 2003, Plaintiff denied any pain in his wrist, and Julie Martinez, M.D., ordered an X-ray. (*Id*. at 93.)

On June 13, 2003, Plaintiff returned to Dr. Lazarus for follow-up on his depression. (*Id*. at 152–53.) Plaintiff reported improvement in his sleep and mood. (*Id*. at 152.) Plaintiff's mental status examination revealed "a mildly depressed, less nervous man compared with his last visit a month ago." (*Id*. at 153.) Plaintiff was assessed with major depressive order and alcohol dependence. (*Id*.)

On June 13, 2003, Dr. Merritt's examination of Plaintiff's wrist X-ray revealed Plaintiff's fracture to be in significant misalignment. (*Id*. at 92.) On June 16, 2003, Dr. Merritt set up an appointment for Plaintiff with an orthopedic surgeon to see if anything could be done to manipulate Plaintiff's fracture back into its normal anatomic position. (*Id*. at 91–92.)

On August 26, 2003, Dr. Merritt assessed Plaintiff with "healed distal radius fracture with shortening and dorsal angulation and subsequent decreased range of motion." (*Id*. at 88.) Plaintiff complained of no pain or discomfort, and Dr. Merritt noted good grip strength. (*Id*.)

On September 15, 2003, Plaintiff returned to Las Vegas Medical Center for follow-up on his depression. (*Id*. at 147–48.) Plaintiff reported sleep problems and heightened depression following his father's death. (*Id*. at 147.) Dr. Lazarus noted Plaintiff was "just slightly more depressed" than he was in June 2003. (*Id*.)

On March 11, 2004, Plaintiff sought treatment at Pueblo Community Heath Center ("Pueblo Community") in Pueblo, Colorado, for problems with chronic left wrist pain, depression, and anxiety. (*Id*. at 182–85.) Ruben Torrez, M.D., noted post-surgical changes in the bones of Plaintiff's left wrist, as well as diminished strength in Plaintiff's left hand, and intact sensation. (*Id*. at 182.) Dr. Torrez assessed Plaintiff with insomnia and a history of anxiety and depression with no suicidal ideation. (*Id*. at 182–83.) On April 1, 2004, Dr. Torrez prescribed Plaintiff a sleeping aid. (*Id*. at 181.)

On May 8, 2004, Plaintiff injured his left arm after hitting a telephone pole while riding his motorcycle intoxicated. (*Id*. at 105–20.) Plaintiff suffered a fracture to his left forearm and a loss of skin, for which he required an emergency surgery, a skin graft, and the insertion of a plate into his arm. (*Id*. at 105–06, 196.) A computed tomography ("CT") scan of Plaintiff's cervical spine revealed some minimal curvature. (*Id*. at 113.)

On January 28, 2005, Kristine Rivera, D.O., began treating Plaintiff at Pueblo Community, and on January 31, 2005, Dr. Rivera diagnosed Plaintiff with insomnia. (*Id*. at 377–78.) On February 23, 2005, Dr. Rivera gave Plaintiff a Patient Health Questionnaire ("PHQ-9") and

diagnosed Plaintiff with depression and drug abuse.[1]  (*Id*. at 376.)  On March 14, 2005, Dr.

Rivera diagnosed Plaintiff with hepatitis C and counseled him to stop drinking.  (*Id*. at 375.)

Between April 18, 2005, and July 13, 2005, Dr. Rivera gave Plaintiff multiple PHQ-9s, and

assessed him at different times with "severe," "improving," and "stable" depression.  (*Id*. at 362,

364, 366, 370–71, 369.)

On April 18, 2005, Dr. Rivera noted Plaintiff had developed an open sore above the

hardware in his left forearm.  (*Id*. at 370–71.)  On May 13, 2005, an X-ray revealed "hardware

loosening and nonunion."  (*Id*. at 279.)  On June 29, 2005, Dr. Rowland surgically removed the

hardware from Plaintiff's arm.  (*Id*. at 318–57.)

On July 6, 2005, Plaintiff returned to Dr. Rowland after falling off a ladder and splitting

his surgical wound open.  (*Id*. at 363, 416.)  Dr. Rowland treated the wound, and by July 20,

2005, noted it was "well healed" and stated Plaintiff could resume unrestricted activities.  (*Id*. at

415–16.)

---

[1]"The nine-item Patient Health Questionnaire-9 (PHQ-9) is derived from the Primary Care
Evaluation of Mental Disorders (PRIME-MD) to assist general practitioners in the diagnosis and
evaluation of psychiatric disorders. . . .  The questionnaire includes items corresponding to each
of the nine depression criteria listed in the [Diagnostic and Statistical Manual of Mental Disorders,
4th Edition], and scores range from [zero] to [twenty-seven].  Cutpoints of [five], [ten], [fifteen],
and [twenty] represent the thresholds for mild, moderate, moderately severe, and severe
depression."  *PHQ-9 Becoming Popular Tool*, PSYCHIATRIC NEWS, June 3, 2005, at 5, *available
at* http://pn.psychiatryonline.org/cgi/content/full/40/11/5-a.

On August 17, 2005, Plaintiff returned to Dr. Rivera for follow-up on his alcoholism,

depression, and hepatitis C. (*Id.* at 470–71.) Plaintiff reported his antidepressant was working

well, but said he "had not slept at all for the last two days." (*Id.* at 471.) Dr. Rivera noted

Plaintiff's left forearm had been doing well since the hardware removal, but observed "some

residual numbness . . . persistent since the original surgery in May 2004." (*Id.*)

On September 9, 2005, Dr. Rivera assessed Plaintiff's depression as "stable, but under

suboptimal control." (*Id.* at 468.) Dr. Rivera recorded that Plaintiff was currently sober, but

needed to pursue more aggressive treatment for his hepatitis C once he had completed a court-

ordered substance abuse treatment program. (*Id.*)

**b.** *Functional Capacity Evaluations*

*(1)* *Evaluations Submitted to the ALJ*

On January 10, 2005, the Disability Determination Service ("DDS") completed a Physical

Residual Functional Capacity ("RFC") Assessment on Plaintiff. (*Id.* at 247–54.) Plaintiff was

diagnosed with a left forearm fracture and status post lumbar spine fusion. (*Id.* at 247.) Plaintiff

retained the capacity to: (1) lift and/or carry twenty pounds occasionally, and ten pounds

frequently; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit for about

six hours in an eight-hour workday; and (5) push and/or pull without limitation. (*Id.* at 247–54.)

---

[2]I only review those records relating to the period before the ALJ's decision. *See, e.g.*, *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (stating the Appeals Council need only consider evidence that is: [1] new; [2] material; and [3] related to period on or before the date of the ALJ's decision).

Further, Plaintiff could occasionally climb, stoop, kneel, crouch, or crawl, but should never have to balance, and should avoid concentrated exposure to hazards. (*Id.* at 249, 251.) Plaintiff had no manipulative, visual, or communicative limitations. (*Id.* at 250–51.) The RFC assessment concluded Plaintiff "should be able to perform light work by [July] 2005." (*Id.* at 248.)

Also on January 10, 2005, Donald G. Glasco, M.D., a DDS consulting physician, completed a Psychiatric Review Technique ("PRT") form, assessing Plaintiff with major depression, anxiety, adjustment disorder, and alcohol abuse. (*Id.* at 258–68, 260, 262, 263.) Dr. Glasco recorded that Plaintiff had experienced no extended episodes of decompensation. (*Id.* at 265.) Noting Plaintiff had been noncompliant in providing updated records, Dr. Glasco concluded "there [was] insufficient information to determine [Plaintiff's] current functional status." (*Id.* at 265, 267.)

On August 18, 2005, Dr. Rivera completed a "Work Capacity Evaluation (Mental)" form. (*Id.* at 359–61.) Dr. Rivera concluded Plaintiff was "extremely limited" in his ability to: (1) understand and remember detailed instructions; and (2) maintain attention and concentration for extended periods. (*Id.* at 359.) Dr. Rivera concluded Plaintiff was "markedly limited" in his ability to: (1) carry out detailed instructions; and (2) sustain an ordinary routine without special supervision. (*Id.*) Dr. Rivera concluded Plaintiff was "moderately limited" in his ability to: (1) remember locations and work-like procedures; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (3) set realistic goals or make plans independently of others. (*Id.* at 359–60.) Dr. Rivera concluded Plaintiff was "slightly limited" in his ability to: (1) understand and remember very short and simple instructions; (2)

carry out very short and simple instructions; (3) work in coordination with or in proximity to others without being distracted by them; (4) make simple work-related decisions; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (8) respond appropriately to changes in work setting; (9) be aware of normal hazards and to take appropriate precautions; and (10) travel in unfamiliar places or use public transportation. (*Id*.) Dr. Rivera based her assessment upon the clinical findings of Plaintiff's major depressive disorder and alcohol/substance abuse. (*Id*. at 360.) Dr. Rivera stated Plaintiff's depression was severe and noted it was "strongly impacted by [Plaintiff's] alcohol/substance abuse." (*Id*. at 361.)

### (2) *Evaluations Before the Appeals Council*

On August 18, 2005, Dr. Rowland completed a medical evaluation form for the Colorado Department of Human Resources regarding Plaintiff's eligibility for state disability benefits. (*Id*. at 489–90.) Dr. Rowland diagnosed Plaintiff with an "open injury to the left forearm" based on an August 11, 2005, examination, and recorded that Plaintiff was unable to use his left arm. (*Id*. at 489.) Dr. Rowland opined that Plaintiff's disability would be expected to last twelve months or longer. (*Id*.)

On August 25, 2005, Dr. Rivera completed the same medical evaluation form for the Colorado Department of Human Resources. (*Id*. at 483–84.) Dr. Rivera diagnosed Plaintiff with major depressive disorder, alcohol dependence, and substance abuse. (*Id*. at 483.) The doctor observed that Plaintiff had nerve damage in his left forearm, but noted his surgical wound was

well healed.  (*Id.*)  Dr. Rivera opined that Plaintiff's disability would be expected to last twelve months or longer.  (*Id.*)

On April 7, 2006, Dr. Rivera completed an "Ability to Do Work-Related Activities (Physical)" form.  (*Id.* at 512–14.)  Dr. Rivera stated Plaintiff could occasionally lift and carry thirty pounds and frequently carry ten pounds.  (*Id.* at 512.)  Further, Plaintiff could stand or walk for less than two hours in an eight-hour workday due to chronic right ankle pain from his past fracture, and could sit for less than two hours in an eight-hour workday due to anxiety.  (*Id.*)  Dr. Rivera noted Plaintiff was impaired in his ability to reach, handle, finger, feel, and push/pull on his left side due to pain in his left arm and wrist.  (*Id.* at 513.)  Dr. Rivera reported Plaintiff should avoid concentrated exposure to humidity, and all exposure to fumes, odors, dusts, gases, poor ventilation, and hazards.  Dr. Rivera opined that Plaintiff's impairments would likely cause him to be absent from work more than three times per month.  (*Id.*)

## 2.    *Procedural History*

On September 2, 2004, Plaintiff filed applications for disability insurance and supplemental security income benefits.  (*Id.* at 49–51, 419–21.)  On January 12, 2005, the Social Security Administration denied Plaintiff's applications.  (*Id.* at 29–32, 423–26.)  On February 15, 2005, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 34–35.)  On August 10, 2005, the ALJ held a hearing, at which Plaintiff and a vocational expert ("VE") testified.  (*Id.* at 515–46.)  Plaintiff was represented by a paralegal.  (*Id.* at 517.)

Plaintiff testified he had been living alone for approximately the last three years, and had a suspended driver's license pending payment of restitution in an automobile accident case.  (*Id.* at

520.)  Plaintiff stated that the last time he had ridden his motorcycle was in May 2004, when he had been in an accident.  (*Id*. at 530–31.)  Plaintiff said he drove approximately two to three times a month to medical appointments when his relatives could not take him.  (*Id*. at 520.)

Plaintiff reported that his regular activities included: (1) sometimes cleaning; (2) sometimes sleeping all day; (3) going to the store alone approximately twice a month; and (4) getting picked up by family members for visits approximately once a week.  (*Id*. at 529–31.)

Plaintiff said he had last worked approximately one year earlier, doing yard work for his daughter's fiancé.  (*Id*. at 521.)  He earned approximately $1,200 from this work, which consisted of "basically just mowing lawns and stuff, and raking up."  (*Id*. at 522.)  Prior to this work, Plaintiff had last worked in 2001, when he was terminated from Xcel Energy due to his tardiness and a loss of confidence, which Plaintiff related to the onset of his depression.  (*Id*. at 522–23, 535.)  Plaintiff's work for Xcel Energy had required: (1) sitting and standing for much of the day; (2) supervising employees; and (3) working approximately sixty hours per week.  (*Id*. at 534.)

Plaintiff explained he could not currently work at any job because: (1) he tired very easily; (2) his back had been bothering him; and (3) surgeries had left his arm and ankle numb.  (*Id*. at 524–25.)  Plaintiff stated infection had prevented the surgical wound on his left forearm from healing for "many, many months," and "the doctor said it's going to . . . [s]tay like that."  (*Id*. at 538.)  Plaintiff said he could "hardly" carry a gallon of milk with his left arm, and that doing so caused him pain.  (*Id*.)

Plaintiff said he could walk "[m]aybe one or two blocks.  If [he] could sit down."  (*Id*.)  He testified he could walk and carry something like a bag of groceries "from [his] car to [his]

house," a distance Plaintiff estimated to be approximately ten feet. (*Id*. at 538–39.) Plaintiff acknowledged he did not use a cane, walker, or brace, and said his ankle still bothered him "somewhat." (*Id*. at 525, 539.)

Plaintiff testified he suffered from depression and anxiety. (*Id* at 526.) Although he was not currently seeing a psychologist or a psychiatrist, he stated that he had seen one approximately three and one half months earlier, and had recently called a therapist recommended by Dr. Rivera. (*Id*. at 527, 536.) Plaintiff said his antidepressant and sleeping aids had improved his depression and anxiety "somewhat." (*Id*.)

Plaintiff described difficulty concentrating, and said he had previously been hospitalized for depression. (*Id*. at 530, 536.) Plaintiff stated his depression made him want to "lay down and sleep" and not "be around nobody [sic]." (*Id.*) Plaintiff said he felt that way "almost every day" for "most of the day." (*Id*.) Plaintiff sometimes slept two or three days in a row, and at other times could not sleep at all. (*Id*. at 536–37.) Plaintiff said his doctors had experienced difficulty finding a sleeping aid that would work for him. (*Id*. at 537.) Plaintiff had lost twenty-two pounds, currently weighed 118 pounds, and was five feet, eight inches tall. (*Id*.)

Plaintiff asserted he drank "very little" alcohol, and had last drunk alcohol six days earlier, when he had two or three beers. (*Id*. at 528.) Plaintiff testified he drank "maybe once or twice a month, at the most." (*Id*.) Plaintiff said he did not use any illegal drugs, and the last time he had used illegal drugs was approximately four or five months earlier. (*Id*. at 529, 539–40.) Plaintiff said he had used cocaine "on and off" for approximately a year and a half, but had not done "a whole lot of it" and had not used any other illegal drugs. (*Id*. at 540.)

The VE testified at the hearing regarding his review of the vocational exhibits in Plaintiff's file. (*Id.* at 540–45.) The VE testified he would classify Plaintiff's past work as a stationary engineer as "medium, SVP [seven], skilled," and his past work as a stationary engineer supervisor as "light, SVP [seven], skilled."[3] (*Id.* at 542.) The VE further testified he expected Plaintiff to have acquired the following transferable skills from his two jobs: (1) operation of control systems for power units; (2) proper care of various power generating units, including boilers, and turbines; (3) supervision of personnel in those settings; and (4) quality control, or checking of temperatures, pressures, and other aspects of a mechanical system. (*Id.*)

The VE then opined on a series of hypothetical questions posed by the ALJ. (*Id.* at 542–44.) The ALJ first asked the VE to opine about an individual who was the same age as Plaintiff and had the same education and past relevant work, and who: (1) could sit, stand, or walk less than two hours each in an eight-hour workday; (2) could lift and/or carry less than ten pounds, even occasionally; (3) could never climb, balance, stoop, kneel, crouch, or crawl; and (4) had a poor ability to deal with all work stress. (*Id.* at 542–43.) The VE testified that such an individual could not perform any work. (*Id.*) The ALJ then asked the VE to opine about an individual who was identically situated to Plaintiff with respect to age, education, and past relevant work, and who: (1) could sit, stand, or walk six out of eight hours with normal breaks; (2) lift and/or carry a maximum of twenty pounds occasionally and ten pounds frequently; (3)

---

[3]Specific Vocational Preparation ("SVP") is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

could never climb ladders, ropes, or scaffolds, but could occasionally climb stairs and balance, stoop, kneel, crouch, or crawl; (4) would have to avoid concentrated exposure to workplace hazards; and (5) could work at jobs involving simple routine tasks, with no high stress. (*Id.* at 543.) The VE testified that such an individual could not perform either of Plaintiff's past jobs, but could perform the jobs of cashier, fast food worker, or driver. (*Id.* at 543–44.) The VE testified that an individual such as the one in the second hypothetical who also could not deal with any work stress or concentrate on job tasks more than occasionally throughout the day could not perform any work. (*Id.* at 545.)

On October 19, 2005, the ALJ issued a decision reflecting his finding that Plaintiff was not disabled within the meaning of the Social Security Act because Plaintiff retained the capacity to perform certain light work. (*Id.* at 19–26.) In reaching his decision, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since June 18, 2001. (*Id.* at 20, 25.) The ALJ next determined that Plaintiff's forearm fracture, status post lumbar spine fusion, and depression were medically determinable, severe impairments. (*Id.* at 25.) Despite their severity, the ALJ determined the impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4. (*Id.*) Additionally, the ALJ found "the claimant's allegations regarding his limitations not totally credible." (*Id.*)

Based on the evidence presented, the ALJ concluded Plaintiff had the RFC to perform light work. (*Id.*) Specifically, the ALJ concluded Plaintiff could: (1) lift or carry twenty pounds occasionally and ten pounds frequently; (2) sit, stand, or walk for six hours in an eight-hour workday; (3) occasionally climb stairs, stoop, kneel, crouch, and crawl; and (5) never climb

ladders.  (*Id.*)  The ALJ concluded Plaintiff should not work at heights or around moving

machinery and retained the ability to perform simple, routine, repetitive tasks in a low-stress

environment.  (*Id.*)  In accord with this RFC assessment, the ALJ determined Plaintiff could

perform work as a cashier, fast food worker, or driver, and therefore, was not disabled.  (*Id.*)

On September 8, 2006, the Appeals Council affirmed the ALJ's decision, making it the

final administrative decision for the purposes of judicial review.  (*Id.* at 5–7.)  On November 6,

2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability

insurance and supplemental security income benefits.  (Compl. [filed Nov. 6, 2006].)  On March

5, 2007, Plaintiff filed his opening brief.  (Pl.'s Opening Br. [filed Mar. 5, 2007] [hereinafter "Pl.'s

Br."].)  On April 23, 2007, the Commissioner filed his response.  (Def.'s Am. Resp. Br. [filed

Apr. 23, 2007] [hereinafter "Def.'s Resp."].)  On May 9, 2007, Plaintiff filed his reply brief.  (Pl.'s

Am. Reply Br. [filed May 9, 2007] [hereinafter "Pl.'s Reply"].)  This matter is fully briefed.

**ANALYSIS**

*1.*     *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance and supplemental security income benefits.  *See*

42 U.S.C.A. § 1383(c)(3) (West 2007) (incorporating review provisions of 42 U.S.C. § 405[g]).

Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported
> by substantial evidence, shall be conclusive, and where a claim has been denied by
> the Commissioner of Social Security or a decision is rendered under subsection (b)
> of this section which is adverse to an individual who was a party to the hearing
> before the Commissioner of Social Security, because of failure of the claimant or

such individual to submit proof in conformity with any regulation prescribed under
subsection (a) of this section, the court shall review only the question of
conformity with such regulations and the validity of such regulations.

42 U.S.C.A. § 405(g) (West 2007). Thus, this court's review is limited to determining whether

the record as a whole contains substantial evidence supporting the Commissioner's decision. *See*

*id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).

The court must uphold the Commissioner's decision if it is supported by substantial evidence. *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant

evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey*

*v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if

it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence

supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also

subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297,

299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meet the insured status requirements, be less than sixty-five years of age, and be

under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.A. § 1382c(a)(3)(A) (West 2007). In proving disability, a claimant must make a *prima facie* showing that he is unable to return to the prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits. *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing the five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations

omitted).  If the claimant is able to perform his previous work, he is not disabled.  20 C.F.R. §

404.1520(f) (2007); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to

demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's

age, education, past work experience; and (2) there is availability of that type of work in the

national economy.  *See* 20 C.F.R. § 404.1520(g) (2007); *Williams*, 844 F.2d at 751.

**3.**     ***Disability Determination***

Plaintiff sets forth three arguments in support of his contention that the ALJ's decision is

erroneous.  Plaintiff argues the ALJ erred in failing to: (1) accord adequate weight to Plaintiff's

treating physician, Dr. Rivera; (2) follow the procedure required by 20 C.F.R. § 404.1520a and

adequately develop the record regarding Plaintiff's mental impairments; and (4) meet his burden

of showing that other work existed in the national economy that Plaintiff was capable of

performing.  I need only address Plaintiff's first two arguments.

**a.**     ***The ALJ's Assessment of Dr. Rivera's Opinion***

It is well established that an ALJ is required to give controlling weight to a treating

physician's opinion, so long as it is well supported by medically acceptable clinical and laboratory

diagnostic techniques and not inconsistent with other substantial evidence of record.  *See* 20

C.F.R. § 404.1527(d)(2) (2007); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)*;*

*Frey*, 816 F.2d at 513.  If an ALJ decides not to give a treating physician's opinion controlling

weight, the ALJ must consider a series of factors in determining the amount of weight to give the

opinion, including: (1) the length of the treatment relationship and the frequency of examination;

(2) the nature and extent of the treatment relationship; (3) the degree the physician's opinion is

supported by relevant evidence; (4) the consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which opinion is rendered; and (6) any other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(d)(2)–(6) (2007); *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995). Should an ALJ choose to disregard the opinion of a treating physician, the ALJ must set forth "specific, legitimate reasons" for doing so. *Hamlin*, 365 F.3d at 1215 (citation and quotation marks omitted).

In the instant case, the ALJ accepted Dr. Rivera's opinion that Plaintiff's depression was "strongly impacted by his alcohol/substance abuse," but nonetheless accorded "less weight" to her overall opinion. (Admin R. at 21.) Specifically, the ALJ rejected Dr. Rivera's assessment that Plaintiff was: (1) extremely limited in his ability to understand and remember detailed instructions; (2) extremely limited in his ability to maintain attention and concentration for extended periods; (3) markedly limited in his ability to carry out detailed instructions; and (4) markedly limited in his ability to sustain an ordinary routine without special supervision. (*Id.* at 21.)

The ALJ proffered two reasons for his rejection of Dr. Rivera's assessment: (1) "Dr. Rivera apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to uncritically accept as true most, if not all, of what the claimant reported;" and (2) "Dr. Rivera is not a mental health specialist." (*Id.* at 21– 22.)

I find that the ALJ failed to articulate specific and legitimate reasons for rejecting Dr. Rivera's assessment. First, the ALJ's unexplained conclusion that Dr. Rivera "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant" and "uncritically

accept[ed]" most of what Plaintiff reported is unsupported by substantial evidence.  (*Id.*)  The "Work Capacity Evaluation (Mental)" form which Dr. Rivera completed asked her to "give . . . an assessment, <u>BASED ON YOUR EXAMINATION</u>, of how this individual's mental/emotional capabilities are affected by any impairments you have diagnosed."  (*Id.* at 359 [emphasis in original].)  In response to a question asking her to describe the "medical/clinical findings that support[ed]" her assessment, Dr. Rivera wrote she was basing her assessment on a diagnosis of Plaintiff's "Major Depressive Disorder–Recurrent" and "Alcohol/Substance Abuse."  (*Id.* at 360.)  Dr. Rivera further referenced a "recent PHQ-9 score: Symptom [nine], Severity [twenty-four]" to support her diagnosis of Plaintiff's depression, noting that the PHQ-9 had been given August 17, 2005, the day before her assessment.  (*Id.*)

My review of Dr. Rivera's treatment record suggests that the doctor consistently employed medically acceptable diagnostic procedures throughout the course of her eight-month treatment of Plaintiff.  The record reflects that Dr. Rivera routinely combined her own observations of Plaintiff's behavior with objective PHQ-9 scores and assessments of Plaintiff's symptoms to reach her diagnostic conclusions.[4]  (*See id.* at 362–78.)  On February 23, 2005, Dr. Rivera noted a PHQ-9 symptom score of six and a severity score of seventeen, and assessed Plaintiff with depression and drug abuse.  (*Id.* at 376.)  On March 24, 2005, Dr. Rivera recorded a

---

[4]Although the PHQ-9 is self-administered, a 2001 study concluded: "In addition to making criteria-based diagnoses of depressive disorders, the PHQ-9 is also a reliable and valid measure of depression severity.  These characteristics plus its brevity make the PHQ-9 a useful clinical and research tool."  *See* Kurt Kroenke et al., *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16 J. GEN. INTERNAL MED. 606 (2001), abstract *available at* http://www.springerlink.com/content/242620040507hl8j.

PHQ-9 symptom score of seven and a severity score of eighteen, and determined that Plaintiff's depression had not improved. (*Id*. at 372–73.) On April 18, 2005, Dr. Rivera noted a PHQ-9 symptom score of eight and a severity score of twenty, observed that Plaintiff appeared "easily tearful with a flat affect," and diagnosed Plaintiff with depression and insomnia. (*Id*. at 370–71.) On May 9, 2005, Dr. Rivera noted a PHQ-9 symptom score of five and a severity score of thirteen, and assessed that Plaintiff's depression was improving. (*Id*. at 366–67.) On July 13, 2005, Dr. Rivera noted a PHQ-9 symptom score of six and a severity score of eleven, noted that Plaintiff was having no suicidal ideation, and assessed that Plaintiff's depression was stable. (*Id*. at 362–63.) While Dr. Rivera may well have relied on a considerable measure of self-reporting in assessing Plaintiff's mental impairments, the ALJ points to no evidence to support his conclusion that Dr. Rivera uncritically assessed Plaintiff's limitations. Such an unfounded conclusion by the ALJ cannot constitute a specific and legitimate reason to support the rejection of Dr. Rivera's assessment. *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("In choosing to reject the treating physician's assessment, an ALJ . . . may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." [internal citation and quotation marks omitted]).

Finally, the ALJ's observation that Dr. Rivera "is not a mental health specialist" does not — standing alone — constitute a legitimate reason to support his rejection of Dr. Rivera's assessment. (Admin R. at 21.) Under 20 C.F.R. § 404.1527(d)(5), the ALJ is permitted to give "*more weight* to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5)

(2007) (emphasis added).  Nonetheless, the ALJ here did not give "more weight" to the

assessment of a mental health specialist than he did to Dr. Rivera's assessment; instead, the ALJ

cited Dr. Rivera's *lack* of mental health specialization as a reason for rejecting her assessment

altogether.  *Cf. Marquez v. U.S. Dep't of Health & Human Servs.*, No. 93-2267, 1994 WL

168254, at *3 n.2 (10th Cir. May 4, 1994) (affirming decision when ALJ gave more weight to the

opinion of a mental health specialist than to the opinion of a doctor who was not a psychiatrist).

The Commissioner has cited no caselaw, and this court has found none, to suggest that an

osteopath, *ipso facto*, is unqualified to assess depression.  On the contrary, 20 C.F.R. §

404.1513(a)(1) states that "[l]icensed physicians (medical or *osteopathic doctors*)" are acceptable

medical sources who can provide evidence establishing a claimant's impairment.  20 C.F.R. §

404.1513(a)(1) (2007) (emphasis added).  As such, I find that the reasons the ALJ proffered for

rejecting Dr. Rivera's assessment were not legitimate.

   **b.    *ALJ's Failure to Follow the Procedure Required by 20 C.F.R. § 404.1520a or
          Adequately Develop the Record Regarding Plaintiff's Mental Impairments***

   Plaintiff's second argument is that the ALJ failed to follow the procedure required by 20

C.F.R. § 404.1520a and adequately develop the record regarding Plaintiff's mental impairments.

(Pl.'s Br. at 15–17.)  I agree.  It is well established that "when there is evidence of a mental

impairment that allegedly prevents a claimant from working, the [Commissioner] must follow the

procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a and the Listing of

Impairments and document the procedure accordingly."  *Cruse v. U.S. Dep't of Health & Human

Servs.*, 49 F.3d 614, 617 (10th Cir. 1995) (citation omitted).  This procedure requires the

Commissioner to first determine the presence or absence of a "medically determinable mental impairment," often referred to as the "Part A" criteria. 20 C.F.R. § 404.1520a(b)(1) (2007). The Commissioner must then rate the "degree of functional limitation resulting from the impairment," using what is often referred to as the "Part B" criteria. *Id.* § 404.1520a(b)(2). To record his conclusions, the Commissioner must prepare a PRT form that tracks the listing requirements and evaluates the claimant under both the "Part A" and "Part B" criteria. *Cruse*, 49 F.3d at 617 (citation omitted). At the ALJ hearing level, "the written decision must incorporate pertinent findings and conclusions based on the technique," and "must include specific findings as to the degree of limitation in each of the functional areas" under the "Part B" criteria. 20 C.F.R. § 404.1520a(e)(2) (2007). This procedure works in conjunction with the sequential evaluation process utilized for the evaluation of physical impairments to ensure "that all evidence needed for the evaluation of a claim which involves a mental impairment is obtained and evaluated." *Hargis v. Sullivan*, 945 F.2d 1482, 1487 (10th Cir. 1991).

I find the ALJ erred in failing to obtain a completed PRT form. Despite 20 C.F.R. § 404.1520a's requirements that the Commissioner prepare a PRT form, and that the ALJ rate the functional limitations flowing from Plaintiff's mental impairments under the "Part B" criteria, the only PRT form on record was completed by Dr. Glasco, a DDS consulting physician, who concluded there was "insufficient evidence" to assess three out of the four functional areas under the "Part B" criteria. (Admin R. at 265.) Specifically, Dr. Glasco concluded there was insufficient evidence to assess Plaintiff's functional limitations in the areas of: (1) restriction of

activities of daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in

maintaining concentration, persistence, or pace.  (*Id.*)

The Commissioner argues the absence of a completed PRT form is irrelevant because

"when the ALJ assessed the limitations flowing from Plaintiff's mental impairments in his decision

. . . he considered all of the evidence, including updated records, treatment notes, Dr. Rivera's

opinion, and hearing testimony."  (Def.'s Resp. at 18.)  This argument misses the mark.  Under 42

U.S.C. § 421(h), the Commissioner is required to make "every reasonable effort to ensure that a

qualified psychiatrist or psychologist has completed the medical portion of the case review and

*any applicable residual functional capacity assessment*" in cases involving a mental impairment.

42 U.S.C.A. § 421(h) (West 2007) (emphasis added).  Under 20 C.F.R. § 404.1520a(e)(3),

moreover, an ALJ has the authority to return a case to "the appropriate Federal component . . .

for completion of the [PRT form]" when a medical expert is unavailable to assist the ALJ in

applying the psychiatric review technique.  20 C.F.R. § 404.1520a(e)(3) (2007).  While it is

undisputed that Dr. Glasco's failure to complete the PRT form prior to the ALJ's review was due

to Plaintiff's noncompliance in providing updated records, this fact does not absolve the ALJ from

his duty to develop a complete record as to material issues.  *See, e.g.*, *Dixon v. Heckler*, 811 F.2d

506, 510 (10th Cir. 1987) (stating that an ALJ has a duty of inquiry to inform himself about

material facts).  If, as the Commissioner argues, the ALJ eventually had sufficient evidence on

which to base his assessment of Plaintiff's functional limitations, then the ALJ also had sufficient

evidence to provide to a medical expert to assist him in making this determination.  Under the

facts of this case, therefore, I find the ALJ erred in failing to obtain a completed PRT form.  *See,*

*e.g.*, *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1048–50 (10th Cir. 1993) (holding, on similar facts, that the ALJ abused his discretion in assessing a claimant's residual functional capacity without first obtaining the assistance of a mental health professional).

Second, even if the ALJ's failure to obtain a completed PRT form was not error, the ALJ's elided analysis of the "Part B" criteria in his decision was. Under 20 C.F.R. § 404.1520a(e)(2), the ALJ "must incorporate pertinent findings and conclusions based on the [PRT]" and his decision "must include specific findings as to the degree of limitation in each of the functional areas" under the "Part B" criteria. 20 C.F.R. § 404.1520a(e)(2) (2007). The ALJ here not only failed to discuss any of the "Part B" criteria in assessing Plaintiff's depression, but also omitted any reference whatsoever to 20 C.F.R. § 404.1520a from his decision. The ALJ's only allusion to the procedure required by 20 C.F.R. § 404.1520a was this ungrammatical and largely inscrutable sentence: "A Disability Determination Service (DDS) consulting physician concluded there was insufficient evidence to determine whether [sic] the degree of mental limitations." (Admin R. at 22.) The Tenth Circuit has remanded under less egregious circumstances, as when an ALJ "repeated the conclusions indicated on the PRT form, but only generally discussed evidence of the [the claimant's] mental impairment." *Cruse*, 49 F.3d at 618; *see also Bird v. Apfel*, 43 F. Supp. 2d 1286, 1290–93 (D. Utah 1999) (remanding where ALJ completed a PRT form, but failed to discuss evidence from a claimant's treating physicians that was inconsistent with conclusions on the form). As such, I find the ALJ's failure to discuss the "Part B" criteria was error.

Finally, even if the ALJ's failure to obtain a completed PRT form and to discuss the "Part B" criteria were not erroneous, the ALJ's failure to follow the procedure laid out in section 404.1520a makes it impossible for this court to assess whether the ALJ's determination of Plaintiff's nondisability was based on substantial evidence. The ALJ's decision never discussed the presence or degree of any functional limitations flowing from Plaintiff's depression under the "Part B" criteria, and the uncompleted PRT form certainly does not speak to this issue. The "Work Capacity Evaluation (Mental)" form completed by Dr. Rivera is similarly inapposite in addressing this question because the categories of functional limitations rated therein only loosely map the "Part B" criteria. *See, e.g.*, *Cruse*, 49 F.3d at 617 ("Instead of seeking data directly tied to the severity of the impairment under Part B of the listing requirements, the mental assessment forms ask for evaluations of a claimant's abilities in three work-related areas: making occupational adjustments, making performance adjustments, and making personal-social adjustments."). No germane assessment of Plaintiff's functional limitations under the "Part B" criteria exists on record.[5] Consequently, the ALJ's failure to obtain a completed PRT form makes it impossible for this court to review whether the ALJ's disability determination was based on substantial evidence. *See, e.g.*, *Robertson v. Chater*, 900 F. Supp. 1520, 1529–30 (D. Kan. 1995) ("The ALJ did not complete and attach to his decision a PRT form. The ALJ did not ask a medical consultant to complete a PRT form. The ALJ's written decision does not substantially track the special

---

[5]The August 25, 2005, medical evaluation form completed by Dr. Rivera for the Colorado Department of Human Resources only states Dr. Rivera's bare conclusion that Plaintiff's disability would be expected to last twelve months or longer. (Admin R. at 483–84).

procedure required for mental impairments. Because the procedure was not followed, the court is unable to determine if substantial evidence supports the ALJ's decision."). Accordingly, I find the ALJ erred by failing to follow the procedure required by 20 C.F.R. § 404.1520a, or alternatively, by inadequately developing the record regarding Plaintiff's mental impairments.

      ***c.***     ***ALJ's Failure to Meet His Burden of Showing That Other Work Existed in the National Economy That Plaintiff Was Capable of Performing***

Plaintiff's final argument is that the ALJ failed to meet his step-five burden of showing that other work existed in the national economy that Plaintiff was capable of performing. (Pl.'s Br. at 18–21.) Because the ALJ's step-three determination that Plaintiff that was not disabled was based on an inadequate record, however, I cannot reach Plaintiff's final argument on the record before me.

**4.**     ***Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is REVERSED and REMANDED for proceedings consistent with this opinion.

Dated this 28th day of November, 2007.

                                        BY THE COURT:


                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        Chief United States District Judge